**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>STEPHEN BUYER,<br><br>        Defendant. | 22-cr-00397-RMB<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT STEPHEN BUYER'S PRE-TRIAL MOTIONS**

Daniel R. Alonso
Olivia A. Rauh
Michael S. Chu
BUCKLEY LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 600-2400
dalonso@buckleyfirm.com
orauh@buckleyfirm.com
mchu@buckleyfirm.com

Henry W. Asbill
BUCKLEY LLP
2001 M Street NW
Washington, DC 20036
Tel: (202) 349-8000
hasbill@buckleyfirm.com

*Attorneys for Defendant Stephen Buyer*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.    TRYING THE WHOLLY UNRELATED SPRINT AND NAVIGANT COUNTS
      TOGETHER WOULD CAUSE SEVERE PREJUDICE TO MR. BUYER. ............. 3

II.   ALL PRIVILEGED COMMUNICATIONS SEIZED BY THE GOVERNMENT
      SHOULD BE SUPPRESSED AND THE COURT SHOULD HOLD A *KASTIGAR*
      HEARING AND DISCLOSE THE GRAND JURY MINUTES TO DETERMINE
      THE EXTENT OF THE TAINT AND FASHION AN APPROPRIATE REMEDY. 8

      A.    Threshold Issue: The Documents Are Privileged ......................................... 9

            1.    The Documents are Also Protected by the Work Product Doctrine ......... 13

      B.    The Prosecution's Unwarranted Intrusion on Mr. Buyer's Attorney-Client
            Privilege Requires a *Kastigar* Hearing. ...................................................... 13

      C.    The Government's Wholly Inadequate Use of a Filter Team Provides an
            Independent Reason to Order a Hearing to Determine the Extent of the Taint. .... 17

      D.    The Court Should Order Disclosure of the Grand Jury Minutes or Alternatively
            Review Them *In Camera*. ........................................................................... 18

III.  THE COURT SHOULD ORDER A *FRANKS* HEARING TO DETERMINE
      WHETHER EVIDENCE SEIZED PURSUANT TO SIXTEEN WARRANTS
      SHOULD BE SUPPRESSED. ...................................................................... 19

      A.    The Court should order a *Franks* hearing because the First and Third Warrants
            included a materially false statement made with reckless disregard for whether it
            would mislead. ........................................................................................... 21

      B.    All subsequent warrants should be suppressed as the fruit of the poisonous tree. 25

      C.    The Court should include in the *Franks* hearing eleven search warrants that
            improperly and materially rely on material omissions about privileged
            communications ......................................................................................... 25

IV.   THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE
      FAVORABLE MATERIAL PURSUANT TO THE *BRADY* DOCTRINE, THE
      COURT'S RULE 5(f) ORDER, AND THE COURT'S INDIVIDUAL PRACTICES.
      ....................................................................................................................... 26

      A.    Materials in the SEC file are subject to the government's obligations under *Brady*
            and its progeny, as well as this Court's individual practices. ............................ 26

B.    The Court should order the government to produce to Mr. Buyer the limited *Brady* and additional evidence requested by counsel..................................................29

**V.    THE COURT SHOULD ORDER A LIMITED BUT NECESSARY BILL OF PARTICULARS**...............................................................................................31

**CONCLUSION** ....................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Brady v. Maryland,*
373 U.S. 83 (1963)............................................................................................ *passim*

*Brigham City v. Stuart,*
547 U.S. 398 (2006)....................................................................................................14

*Franks v. Delaware,*
438 U.S. 154 (1978)............................................................................................ *passim*

*In re Grand Jury Subpoena Dated July 6, 2005,*
510 F.3d 180 (2d Cir. 2007).......................................................................................13

*Hickman v. Taylor,*
329 U.S. 495 (1947)....................................................................................................13

*In re Horowitz,*
482 F.2d 72 (2d Cir. 1973)...........................................................................................9

*Illinois v. Gates,*
462 U.S. 213 (1983).............................................................................................22, 23

*Kastigar v. United States,*
406 U.S. 441 (1972)............................................................................................ *passim*

*Kyles v. Whitley,*
514 U.S. 419 (1995)....................................................................................................27

*Nash v. United States,*
54 F.2d 1006 (2d Cir. 1932)..........................................................................................6

*Riley v. California,*
573 U.S. 373 (2014)....................................................................................................14

*Russell v. United States,*
369 U.S. 749 (1962)....................................................................................................33

*In re Search Warrants Executed on Apr. 28, 2021,*
No. 21-MC-425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ...................................17

*United States v. Allen,*
864 F.3d 63 (2d Cir. 2017)...................................................................................13, 14

*United States v. Allen,*
No. 14 Cr. 272 (JSR), 2016 WL 315928 (S.D.N.Y. Jan. 8, 2016) .........................9, 10, 12, 13

*United States v. Avenatti*,
    559 F. Supp. 3d 274 (S.D.N.Y. 2021) ....................................................18

*United States v. Awadallah*,
    349 F.3d 42 (2d Cir. 2003)...................................................................20

*United States v. Backhtiari*,
    913 F.2d 1053 (2d Cir. 1990)..............................................................24

*United States v. Bagley*,
    473 U.S. 667 (1985)............................................................................27

*United States v. Blau*,
    159 F.3d 68 (2d Cir. 1998)..................................................................14

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)..........................................................31, 34

*United States v. Brozyna*,
    571 F.2d 742 (2d Cir. 1978)................................................................33

*United States v. Canfield*,
    212 F.3d 713 (2d Cir. 2000)................................................................20

*United States v. Christopher*,
    No. 19 CR 875-LTS, 2020 WL 5518216 (S.D.N.Y. Sept. 13, 2020)...............................22, 23

*United States v. Coleman*,
    22 F.3d 126 (7th Cir. 1994) ...................................................................3

*United States v. Contorinis*,
    No. 09 Cr. 1083 (RJS), slip. op. (S.D.N.Y. May 5, 2010)........................................34

*United States v. Correia*,
    468 F. Supp. 3d 618 (S.D.N.Y. 2020).....................................................9

*United States v. Daniels*,
    281 F.3d 168 (5th Cir. 2002) ...............................................................15

*United States v. DeFonte*,
    441 F.3d 92 (2d Cir. 2006)............................................................10, 12

*United States v. Falbo*,
    No. 92 CR. 0763 (PNL), 1993 WL 147441 (S.D.N.Y. April 6, 1993)..................................34

*United States v. Frey*,
    2:19-cr-537, 2022 WL 2359665 (E.D.N.Y. June 30, 2022) .......................................6

*United States v. Gasparik*,
   141 F. Supp. 2d 361 (S.D.N.Y. 2001)......................................................................................4

*United States v. Ghailani*,
   743 F. Supp. 2d 242 (S.D.N.Y. 2010)....................................................................................15

*United States v. Gibson*,
   175 F. Supp. 2d 532 (S.D.N.Y. 2001)....................................................................................18

*United States v. Gil*,
   297 F.3d 93 (2d Cir. 2002)....................................................................................................31

*United States v. Griffin*,
   811 F. App'x 683 (2d Cir. 2020) .............................................................................................3

*United States v. Gruttadauria*,
   439 F. Supp. 2d 240 (E.D.N.Y. 2006) .....................................................................................6

*United States v. Gupta*,
   848 F. Supp. 2d 491 (S.D.N.Y. 2012)........................................................................27, 28, 29

*United States v. Hess*,
   124 U.S. 483 (1888)..............................................................................................................33

*United States v. Hoey*,
   725 F. App'x 58 (2d Cir. 2018) .............................................................................................14

*United States v. Hoey*,
   No. 15 Cr. 229 (PAE), 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) .......................................15

*United States v. Hsu*,
   669 F.3d 112 (2d Cir. 2012).....................................................................................................7

*United States v. Jawara*,
   474 F.3d 565 (9th Cir. 2007) ...................................................................................................3

*United States v. Jimenez*,
   265 F. Supp. 3d 1348 (S.D. Ala. 2017).......................................................................10, 12, 13

*United States v. Jones*,
   16 F.3d 487 (2d Cir. 1994).......................................................................................................6

*United States v. Juwa*,
   508 F.3d 694 (2d Cir. 2007)...................................................................................................24

*United States v. Kirton*,
   No. 20-CR-322 (PMH), 2021 WL 1550423 (S.D.N.Y. Apr. 20, 2021) ..................................18

*United States v. Lahey*,
   967 F. Supp. 2d 698 (S.D.N.Y. 2013) .................................................................21, 22, 24

*United States v. Lambus*,
   897 F.3d 368 (2d Cir. 2018) .................................................................................................20

*United States v. Landji*,
   No. (S1) 18 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) .........10, 12, 14, 15

*United States v. Leung*,
   40 F.3d 577 (2d Cir. 1994) ...................................................................................................18

*United States v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012) .................................................................................................28

*United States v. Martin*,
   426 F.3d 68 (2d Cir. 2005) ...................................................................................................24

*United States v. Martinez*,
   994 F.3d 1 (1st Cir. 2021) .......................................................................................................7

*United States v. Martoma*,
   990 F. Supp. 2d 458 (S.D.N.Y. 2014) .............................................................................28, 29

*United States v. McKenzie*,
   13 F.4th 223 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 2766 (2022) ...................................22, 23

*United States v. Mejia*,
   655 F.3d 126 (2d Cir. 2011) ...................................................................................................9

*United States v. Nacchio*,
   05-cr-00545-EWN, 2006 WL 2475282 (D. Colo. August 25, 2006) .....................................34

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) .....................................................................................34

*United States v. Nanni*,
   59 F.3d 1425 (2d Cir. 1995) ...........................................................................................13, 14

*United States v. Neill*,
   952 F. Supp. 834 (D.D.C. 1997) ...........................................................................................17

*United States v. Polanco*,
   No. 19 CR 354-LTS, 2020 WL 1503672 (S.D.N.Y. Mar. 30, 2020) .....................................20

*United States v. Rajaratnam*,
   719 F.3d 139 (2d Cir. 2013) .................................................................................................21

vi

*United States v. Rajaratnam*,
No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ......................21, 22, 24

*United States v. Sampson*,
385 F.3d 183 (2d Cir. 2004)..........................................................................................4, 5, 6

*United States v. Santoro*,
647 F. Supp. 153 (E.D.N.Y. 1986) ....................................................................................34

*United States v. Schwimmer*,
924 F.2d 443 (2d Cir. 1991)...............................................................................9, 13, 15, 18

*United States v. Sharma*,
No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019)..................................14

*United States v. Smith*,
112 F.2d 83 (2d Cir. 1940)....................................................................................................5

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990)................................................................................................33

*United States v. Tuzman*,
301 F. Supp. 3d 430 (S.D.N.Y. 2017)....................................................................................5

*United States v. Ventresca*,
380 U.S. 102 (1965)............................................................................................................23

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998)..................................................................................................5

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999)..................................................................................................33

*United States v. Williams*,
365 F. Supp. 3d 343 (S.D.N.Y. 2019)..................................................................................25

*United States v. Wozniak*,
126 F.3d 105 (2d Cir. 1997)................................................................................................33

*Upjohn Co. v. United States*,
449 U.S. 383 (1981)..............................................................................................................9

*Wong Sun v. United States*,
371 U.S. 471 (1963)............................................................................................................25

**Statutes**

18 U.S.C. § 1348...................................................................................................................2

18 U.S.C. § 3500......................................................................................................................30, 31

15 U.S.C. § 78j(b).........................................................................................................................2

**Other Authorities**

17 C.F.R. § 240.10b-5..................................................................................................................2

U.S. Const. amend. IV ....................................................................................................13, 14, 20

U.S. Const. amend. V.......................................................................................................13, 14, 15

U.S. Const. amend. VI ........................................................................................................7, 33, 34, 35

Eric D. Mcarthur, *The Search and Seizure of Privileged Attorney-Client
    Communications*, 72 U. Chi. L. Rev. 729 (2005) ....................................................................13

Fed. R. Crim. P. 5(f) ........................................................................................................26, 29, 35

Fed. R. Crim. P. 6(e)(3)(E)(ii) ...................................................................................................18

Fed. R. Crim. P. 7(f) ..............................................................................................................32, 33

Fed. R. Crim. P. 8(a) ..................................................................................................................3, 5

Fed. R. Crim. P. 14(a) ..............................................................................................................3, 5, 6

Fed. R. Crim. P. 16(a)(1)(E)(i) .............................................................................................30, 33

Fed. R. Evid. 403 ..........................................................................................................................7

Fed. R. Evid. 404(b)...................................................................................................................4, 7

H. Marshall Jarrett, et al., U.S. Dep't of Just., *Searching and Seizing Computers
    and Obtaining Electronic Evidence in Criminal Investigations* (2009) ..................................17

Hon. Richard C. Berman, *Pre-trial Procedures, Prior to Trial in Criminal Cases*
    § 5.C.2.d (Nov. 16, 2020) ......................................................................................................28

Joel D. Lieberman & Jamie Arndt, *Understanding the Limits of Limiting
    Instructions*, *in* 6 Psych. Pub. Pol'y & L. 677 (2000) ...........................................................7

Larry Neumeister, *Ex-US Congressman Among 9 Charged in Insider Trading
    Cases*, U.S. News & World Report (July 25, 2022) ...............................................................27

Nancy Steblay et al., *The Impact on Juror Verdicts of Judicial Instruction to
    Disregard Inadmissible Evidence: A Meta-Analysis*, *in* 30(4) L. & Hum.
    Behav. 469 (2006)....................................................................................................................6

Nat'l Registry of Exonerations, https://tinylink.net/G5KkX .......................................................28

U.S. Att'ys' Off., S.D.N.Y., SEC, *Press Conference* (July 25, 2022)..........................................27

U.S. Att'ys' Off., S.D.N.Y., *U.S. Attorney Announces Charges in Four Separate Insider Trading Cases Against Nine Individuals* (July 25, 2022)............................................28

U.S. Att'ys' Off., S.D.N.Y., U.S. Dep't of Just., *U.S. Attorney Announces Charges in Four Separate Insider Trading Cases Against Nine Individuals, Including Former U.S. Congressman, Former FBI Agent Trainer, Tech Company Executives, and Former Investment Banker* (July 25, 2022) ....................................................27

U.S. SEC, *SEC Charges Former Indiana Congressman with Insider Trading* (July 25, 2022) ....................................................................................................................27

8 Wigmore, Evidence § 2292 (McNaughton rev. 1961).................................................................9

**INTRODUCTION**

Defendant Stephen Buyer respectfully submits this memorandum of law in support of his pre-trial motions, all of which are directed to his right to a fair trial. In its scorched earth investigation of two wholly unconnected sets of securities transactions, the government improperly accessed and used materials protected by the attorney-client privilege and work product doctrine and additionally misled the Magistrate Judges who signed warrants for electronic materials. The result is an indictment laden with the prejudicial fruits of these violations, including a screenshot created by Mr. Buyer specifically to seek advice from counsel. Worse, the government has alleged two unrelated fact patterns together in one indictment, creating insurmountable prejudice that can only be remedied by severing the relevant counts. Finally, the government has denied or functionally denied limited discovery and bill of particulars requests, hampering the ability to prepare Mr. Buyer's defense.[1]

**FACTUAL BACKGROUND**

Mr. Buyer, a former nine-term Republican member of Congress from Indiana, stands accused of securities fraud in connection with his post-Congressional private consulting work for two companies: Guidehouse and T-Mobile U.S. Inc. Mr. Buyer denies any wrongdoing and asserts his innocence as to all charges. In late 2019, Mr. Buyer engaged counsel to assist him with issues that had been raised by Guidehouse and by the Financial Industry Regulatory Authority ("FINRA") in connection with one of the two sets of circumstances ultimately alleged in the present case. Less than a year later, agents and prosecutors executed search warrants for Mr. Buyer's

---

[1] Undersigned counsel has, where appropriate, met and conferred with the government as to the substance of all motions directed to discovery and a bill of particulars. With a limited exception noted in Section IV, those efforts were unsuccessful.

electronic communications but did not initially engage a filter team to withhold materials potentially protected by the attorney-client privilege. Those initial warrants led to the government's seizure of multiple privileged materials, which the government exploited in subsequent warrant affidavits and in the indictment itself, causing substantial prejudice.

The indictment (ECF No. 1) (the "Indictment") charges two substantive counts of violating the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and two substantive counts of securities fraud, 18 U.S.C. § 1348. The two alleged schemes are unrelated and are built on distinct sets of circumstantial facts. Specifically, the Indictment alleges that Mr. Buyer engaged in two separate insider trading schemes in 2018 (the "Sprint Counts") and 2019 (the "Navigant Counts"), by misappropriating and trading on material non-public information ("MNPI") he supposedly learned through his consulting work for T-Mobile and Guidehouse, respectively. Indictment ¶¶ 2, 8, 24, 41 and 45. The Indictment does not specify the source or timing of, or details about, the nature of the MNPI that it alleges Mr. Buyer misappropriated and on which he is alleged to have traded. The Indictment provides instead allegations comprised of circumstantial facts surrounding the timing of Mr. Buyer's trades and his contact with corporate personnel. *See* Indictment ¶¶ 14, 15, 19, 20, 32. It alleges generally that Mr. Buyer "defrauded T-Mobile of confidential information related to T-Mobile's renewed merger discussions with Sprint," Indictment ¶ 43, and "defrauded Guidehouse of confidential information related to Guidehouse's negotiations to acquire Navigant," Indictment ¶ 47. The Indictment contains nothing to relate the Sprint Counts to the Navigant Counts other than the single conclusory opinion that he twice engaged in insider trading. Indictment ¶ 24.

**ARGUMENT**

**I.    TRYING THE WHOLLY UNRELATED SPRINT AND NAVIGANT COUNTS TOGETHER WOULD CAUSE SEVERE PREJUDICE TO MR. BUYER.**

The government's decision to join unrelated transactions in the same indictment will be devastating to Mr. Buyer's ability to obtain a fair trial. The Sprint Counts and Navigant Counts are completely unconnected, but their joinder here blurs the lines between transactions that involve players, securities, and time frames that do not overlap. Even assuming *arguendo* that joining the charges was permissible under Fed. R. Crim. P. 8(a) because they are "of the same or similar character,"[2] the risk of spillover prejudice and the ineffectiveness of a curative instruction make this the rare case in which the Court should grant severance pursuant to Rule 14(a) because joinder "appears to prejudice [the] defendant." We therefore move the court to order separate trials for the Sprint Counts (Counts 1 and 2) and the Navigant Counts (Counts 3 and 4).

The Indictment makes clear that the government is counting on the jury's conflating the alleged sets of offenses, or at a minimum that the evidence of one set will improperly bolster the prosecution's prospects on the other. After describing the alleged conduct involving the Sprint Counts, the Indictment tellingly alleges, "The T-Mobile-Sprint merger was not the only instance in which [Mr. Buyer] engaged in insider trading." Indictment ¶¶ 8-23, 24. The Indictment then describes the alleged conduct involving Navigant, conceding *sub silentio* that no fact connects them. Indictment ¶¶ 24-39. Indeed, the charges refer to no common actors or participants (aside

---

[2] Circuits are split as to when offenses are "of a same or similar character" for Rule 8(a) purposes. *Compare United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994) (permitting joinder where offenses merely "of like class" and "not connected temporally or evidentially"), *with United States v. Jawara*, 474 F.3d 565, 578 (9th Cir. 2007) (considering multiple complicated elements in evaluating joinder). We acknowledge that the Second Circuit favors the former minority "categorical approach," where proper joinder is essentially presumed. *United States v. Griffin*, 811 F. App'x 683, 685 (2d Cir. 2020). We submit the majority "holistic approach" is better reasoned, consistent with Supreme Court precedent, and reserve the right to challenge apparently controlling Circuit precedent if necessary on appeal on grounds that Rule 8(a) is unconstitutional as applied.

from Mr. Buyer), no overlapping or related companies or securities, and no overlapping timeframes. In light of the wholly circumstantial nature of both cases, presenting both charges to the same jury would morph two weak cases into one whose strength derives largely from an inference that would be impermissible if each were charged separately. *See United States v. Sampson*, 385 F.3d 183, 192 (2d Cir. 2004) (noting, in the context of Fed. R. Evid. 404(b), that "propensity reasoning is plainly barred"); *United States v. Gasparik*, 141 F. Supp. 2d 361, 373 (S.D.N.Y. 2001) (barring under Rule 404(b) testimony of witness regarding "an entirely separate scheme").

Consider a juror who hears that someone has been charged with insider trading based on information learned while acting as a corporate consultant for *one* client. Our hypothetical juror, following her oath, would wait and see what the evidence is and whether it establishes the elements of the crime. Maybe she would be convinced of the defendant's guilt—but maybe not. Now, consider that the same juror hears that the defendant is alleged to have done something similar—but wholly unrelated—on a different occasion. It is beyond cavil that she would quickly conclude that the defendant's successful trading in stock relating to not one but *two* clients is too coincidental—lightning does not strike twice in the same spot—and therefore must have been the result of a criminal misdeed.[3] The mental gymnastics necessary to avoid such conclusions are just too difficult and would quickly overwhelm the actual evidence on each count. And that's precisely the point: a joint trial here would simply not be a fair fight.

The Second Circuit recognized this common-sense principle more than 80 years ago, teaching that joinder of multiple charges against a defendant may result in prejudice because "even

---

[3] This effect would no doubt be bolstered by the bias Mr. Buyer faces as a former Republican congressman on trial in a New York City-based district, in which the five counties from which jurors are drawn overwhelmingly lean Democratic, and fully 88% of registered voters are not Republicans. *See Enrollment by County,* N.Y. State Bd. of Elections (Feb. 21, 2022).

when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one." *United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940). For that reason, Fed. R. Crim. P. 14(a) permits courts to order separate trials "[i]f the joinder of offenses…in an indictment…appears to prejudice a defendant or the government." Even where joinder was proper under Rule 8(a), severance may be granted where the defendant shows that the prejudice from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998); *see Sampson,* 385 F.3d at 190 (requiring "substantial prejudice" for Rule 14(a) severance).

The government will no doubt make the superficially appealing arguments that (a) principles of efficiency and judicial economy outweigh the risk of prejudice, and (b) any spillover prejudice can be cured by an appropriate limiting instruction. As to the first, there is no question that courts do, and should, prefer to try one case rather than two.[4] But such cases typically involve mutually interdependent conduct premised on a common scheme or plan. *See United States v. Tuzman*, 301 F. Supp. 3d 430, 441 (S.D.N.Y. 2017) (Gardephe, J.) (indictment charged "complex web of interrelated and overlapping fraud."). Here, however, the alleged schemes are neither interrelated nor interdependent in any way. The government's presentation of evidence with respect to the Sprint Counts and the Navigant Counts is not expected to overlap, and any attempt to make the jury believe they are part of a common scheme or plan would be unsupported and cause jury confusion. Following the principle that "unlimited use of [a predecessor to Rule 8(a)] should not be tolerated in the name of convenience alone," *Smith,* 112 F.2d at 85, courts in this Circuit have

---

[4] Notwithstanding that, any argument that joinder here is more efficient is speculative. For example, if Mr. Buyer were convicted in a severed trial, the government might well choose not to try the remaining counts. And severing the two transactions will obviate both mid-trial and potential appellate arguments related to the palpable unfairness of the government's joinder decision.

required severance of counts when they do not relate to each other in logic, fact, participants, or timeframe. *See Sampson*, 385 F.3d at 190 (reversing denial of severance motion under Rule 14(a) where similar crimes were allegedly committed at independent times and defendant showed substantial prejudice); *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (reversing conviction for failure to sever bank robbery counts from acquitted felon-in-possession charge); *United States v. Frey*, 2:19-cr-537 (DRH), 2022 WL 2359665, at *3 (E.D.N.Y. June 30, 2022) (granting severance because counts lacked any "logical connection"); *United States v. Gruttadauria*, 439 F. Supp. 2d 240, 252 (E.D.N.Y. 2006) (Spatt, J.) (severing counts "not related . . . by facts or participants" that "d[id] not arise out of the same common plan or scheme.").

Nor would a limiting instruction cure the prejudice in this case because in many circumstances jurors cannot be reliably expected to follow them. The Second Circuit recognized this in *Jones,* 16 F.3d at 493, reversing a bank robbery conviction for failure to sever a charge that required an underlying felony conviction. The Court found it "quixotic to expect the jurors to perform such mental acrobatics" as would be required to heed the limiting instructions. *Id*. Further, "[t]he presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *Id.; see also Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir. 1932) (L. Hand, J.) (instruction to disregard inadmissible hearsay required "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else."). Unsurprisingly, social science research strongly supports the principle that juries do not reliably follow limiting instructions. *See* Nancy Steblay et al., *The Impact on Juror Verdicts of Judicial Instruction to Disregard Inadmissible Evidence: A Meta-Analysis*, *in* 30(4) L. & Hum. Behav. 469, 486 (2006) ("Meta-analysis" of 175 experimental results spanning 30 years found that

"the aggregate data indicate that the presence of inadmissible evidence affects verdicts in line with the evidentiary slant of the information" and "a corrective judicial admonition does not fully eliminate the impact."); *see also* Joel D. Lieberman & Jamie Arndt, *Understanding the Limits of Limiting Instructions*, *in* 6 Psych. Pub. Pol'y & L. 677, 703 (2000) ("[T]he majority of extant empirical research indicates that jurors do not adhere to limiting instructions. Unless jurors follow the instructions, Sixth Amendment guarantees to a fair trial are threatened.").[5]

A final factor supporting severance is that evidence of neither scheme alleged here would be admissible under Fed. R. Evid. 404(b) and 403 in the trial of the other. *See United States v. Martinez,* 994 F.3d 1, 15 (1st Cir. 2021) (reversing denial of severance where separate scheme would have been inadmissible at stand-alone trial under Rules 404(b) and 403 because of "grave risk of spillover prejudice."). If the Court severs the charges, evidence of each separate scheme would constitute impermissible propensity evidence under Rule 404(b). *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (under Rule 404(b), "evidence that a defendant committed crimes beyond those presented to the jury is not admissible to show that the defendant is a bad person who is therefore likely to be guilty of the crimes charged."). And, notably, the separate scheme would not be admissible as a 404(b) permissible use—that it was part of a "common scheme or plan" or "inextricably intertwined" with the charges—because that is decidedly absent here.

For all these reasons, the Court should resist the lure of the judicial efficiency argument and reject a limiting instruction as a way around the spillover prejudice that arises when any human being hears that someone supposedly "did it" twice. Mr. Buyer deserves a fair chance to defeat these charges on their merits, without having to repeatedly explain why the Sprint Counts do not

---

[5] Because the Court disfavors extensive exhibits, we have not submitted copies of non-legal articles cited in this submission. Copies of all such articles are on file with the undersigned and available upon request to the Court or the government.

prove his guilt on the Navigant Counts, and vice versa. Accordingly, we urge the Court to order separate trials here where fundamental fairness substantially outweighs efficiency.

## II.    ALL PRIVILEGED COMMUNICATIONS SEIZED BY THE GOVERNMENT SHOULD BE SUPPRESSED AND THE COURT SHOULD HOLD A *KASTIGAR* HEARING AND DISCLOSE THE GRAND JURY MINUTES TO DETERMINE THE EXTENT OF THE TAINT AND FASHION AN APPROPRIATE REMEDY.

In November 2019, Mr. Buyer engaged attorneys at Buckley LLP (none of the under-signed) to represent him in relation to the FINRA investigation of the same Navigant trades at issue in Counts 3 and 4 of the Indictment. After receiving legal advice, Mr. Buyer selected and made electronic copies ("screenshots") of text communications he believed were relevant to his defense and emailed them to himself with the subject line "Privileged" to make them available on his computer for the purpose of discussion with or provision to counsel. Mr. Buyer then forwarded the vast majority of these screenshots to counsel for their review and use in his legal representation, also with the subject line, "Privileged."

Some nine months after Mr. Buyer's interactions with counsel, the government executed a search warrant on internet providers and obtained approximately thirty of Mr. Buyer's "self-emails" marked "Privileged."[6] The FBI then included direct quotations from privileged materials in a grand total of seven affidavits in support of eleven additional search warrants, as well as in the Indictment in this matter. By ignoring clear demarcations of privilege, the government improp-erly interfered with the attorney-client relationship between Mr. Buyer and his counsel formed to advise him on circumstances involved in this very case. Worse, in several search warrant affidavits, the government specifically mentioned that certain of the self-emails were marked "Privileged"—

---

[6] The government does not appear to have seized the forwards of those emails to counsel.

without also mentioning that he had counsel—the clear implication being that those had particularly sinister import.[7] This inexplicable interference tainted Mr. Buyer's prosecution irreparably: the documents and records seized in this matter cannot be untangled from the violation of his privilege, and the entire prosecution team has been irreparably tainted by exposure to the multiple privilege violations. The Court should therefore hold a *Kastigar* hearing per the Second Circuit's decision in *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) and impose an appropriate remedy, including some combination of suppression of all fruits of the privileged material, dismissal of the Indictment, and disqualification of the prosecution team.

A.      Threshold Issue: The Documents Are Privileged

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Allen*, No. 14 Cr. 272 (JSR), 2016 WL 315928, at *2 (S.D.N.Y. Jan. 8, 2016) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). This privilege exists to protect "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020) (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)). According to Wigmore, where a client seeks "legal advice of any kind" from a lawyer, confidential "communications relating to that purpose" are "permanently protected" unless waived. *See In re Horowitz*, 482 F.2d 72, 80 n. 7 (2d Cir. 1973) (quoting 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961)).

---

[7] We have included one example, the Affidavit in Support of 21 MJ 918 (S.D. In.) (the "Seventh Warrant"), because the full set of warrants is voluminous. *See* Alonso Decl. Ex. H. We have also included the first warrant, 20 MAG 8471 (S.D.N.Y.). *See* Section III; Alonso Decl. Ex. D. We are of course prepared to provide the Court with any and all warrants and affidavits at its request.

The Second Circuit has held that a client's notes or outlines created to guide conversations with their attorneys fall "squarely within" the scope of attorney-client privilege. *See United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006). This is true even if those notes are not actually communicated to the attorneys, at least where the notes were taken "pursuant to a direction from his attorney for the purpose of engaging in a discussion with his attorney." *Allen*, 2016 WL 315928 at *2; *see also DeFonte,* 441 F.3d at 96 (defining privilege to include a journal never delivered to client's attorney); *United States v. Landji*, No. (S1) 18 Cr. 601 (PGG), 2021 WL 5402288, at *16 n. 23 (S.D.N.Y. Nov. 18, 2021) (reading *Allen* to mean that "markings prepared by the client at the lawyer's direction were privileged."). Unsurprisingly, notes that a client emailed to himself are protected by attorney-client privilege if those notes were created at the direction of an attorney. *United States v. Jimenez*, 265 F. Supp. 3d 1348, 1351 (S.D. Ala. 2017) (relying on Second Circuit's *DeFonte* case, finding that emails were protected where client sent only to himself emails containing notes for the purpose of conveying thoughts to counsel to use in defense strategy).

At issue here are screenshots of text messages that Mr. Buyer created in response to his attorneys' requests. As explained more thoroughly in the accompanying declarations of Timothy Coley and Thomas Sporkin ("prior Buckley attorneys"), Buckley LLP ("Buckley") represented Mr. Buyer in November and December 2019.[8] Buyer Declaration ¶ 2; Coley Declaration ¶ 3; Sporkin Declaration ¶ 3; Indictment ¶¶ 24–37. As part of that representation, the prior Buckley attorneys met with Mr. Buyer on November 12, 2019, at which time Mr. Buyer showed them a

---

[8] Portions of the Coley, Sporkin, and Buyer Declarations, as well as the self-emails and attachments in question, are being submitted for the Court's *in camera* review to protect Mr. Buyer's attorney-client privilege. Any references to them here are meant to assist the Court and the government and are not intended as a waiver of any privileges Mr. Buyer may have. For the same reason, we will not repeat the contents of the Signal Text here, but please note that it is quoted in the Indictment at ¶ 39, and in multiple search warrant affidavits. *See infra* note 10.

piece of evidence that is discussed more fully in the *in camera* portions of the declarations of the prior Buckley attorneys. The prior Buckley attorneys gave Mr. Buyer instructions relating to the preservation of that item and other relevant communications. Buyer Decl. ¶ 8; Coley Decl. ¶ 6; Sporkin Decl. ¶ 6. Additionally, the prior Buckley attorneys instructed Mr. Buyer with respect to additional texts and emails. Buyer Decl. ¶ 9; Coley Decl. ¶ 7; Sporkin Decl. ¶ 7. Mr. Buyer included the word "Privileged" in all messages he prepared for or sent to the prior Buckley attorneys on their advice. Buyer Decl. ¶¶ 9-11; Coley Decl. ¶¶8-10.

Mr. Buyer selected particular text messages from his device, deciding which were most relevant and taking screenshots of his selected messages for the purpose of having them available for his attorneys. Buyer Decl. ¶¶ 10-11. For the same purpose, he also took a screenshot of a November 2, 2019 text message that on its face appears to be between him and a Guidehouse employee on the messaging platform "Signal" (the "Signal Text"). Buyer Decl. ¶ 15. To ensure that he had all of these text message screenshots gathered in his email account, which he accessed via his computer, for the purpose of sending to or discussing with counsel, Mr. Buyer then emailed those selections to himself with the subject line "Privileged." Buyer Decl. ¶¶ 10, 15. He then forwarded those emails to one of the prior Buckley attorneys. Buyer Decl. ¶ 9; Coley Decl. ¶ 10. He did not forward the email containing the screenshot of the Signal Text (the "Signal Text Screenshot"), for the reason explained in his declaration. Buyer Decl. ¶ 15.

All of the screenshots and the emails transmitting those screenshots are privileged under the same reasoning that protects client notes and outlines. Like notes or outlines, screenshots of text messages do not simply exist in the normal course of business, because sending a text does not automatically create a screenshot. An affirmative step must be taken to create one. In Mr. Buyer's case, he took that step in response to the prior Buckley attorneys' requests and instructions

11

and to further their discussions about the matter for which they were engaged. *See Allen,* 2016 WL 315928 at *2 (privilege applies to notes taken "pursuant to a direction from his attorney for the purpose of engaging in a discussion with his attorney"). In effect, all of the emails, whether to himself or to counsel, were communications from a client to an attorney specifically seeking legal advice. Like notes, the screenshots did not exist until Mr. Buyer put thought into action, whether by writing words (notes) or hitting the necessary buttons to take a screenshot (as Mr. Buyer did). Like an outline, the goal of these screenshots was to quickly and easily reference specific information to guide intended later conversations between Mr. Buyer and the prior Buckley attorneys.

On a granular level, the analysis for the screenshots Mr. Buyer emailed himself and later forwarded to counsel differs slightly from that for the Signal Text Screenshot. The communication requirement that was critical to the Second Circuit's analysis in *DeFonte* is plainly satisfied as to those screenshots Mr. Buyer later forwarded to the prior Buckley attorneys. *See DeFonte*, 441 F.3d at 96. That he emailed them to himself as an intermediate step is irrelevant. *See id.* at 95–96 (prisoner's journal entries to himself about conversations he wanted to have with his lawyers were privileged even though journal was not delivered to attorney); *see also Jimenez*, 265 F. Supp. 3d at 1352 (notes client emailed to himself were privileged notwithstanding that they were not delivered to counsel). As relevant to the Signal Text Screenshot, Judge Rakoff persuasively explained in *Allen* that the attorney-client privilege recognized in *DeFonte* extends to client notes that were created for but ultimately not sent to counsel. 2016 WL 315928, at *2; *see also Landji*, 2021 WL 5402288, at *16 n. 23 (reading *Allen* to protect unsent notes or outlines created pursuant to counsel's instruction). Here, the prior Buckley attorneys gave Mr. Buyer clear instructions and advice, discussed in the *in camera* portions of their declarations, pursuant to which Mr. Buyer created the Signal Text Screenshot and others, and sent them to himself. Coley Decl. ¶¶ 6-7, 10; Sporkin Decl.

¶¶ 6-7; Buyer Decl. ¶¶ 10, 14-15. Nothing more is required under the reasoning in *Allen* and *Jimenez* and, accordingly, the Signal Text Screenshot is privileged, as are all the other self-emails.

    1.   The Documents are Also Protected by the Work Product Doctrine

In addition to being privileged, the screenshots and the self-emails labeled "Privileged" meet the traditional requirements for work-product protection. The screenshots "were prepared 'at the behest of counsel in anticipation of litigation.'" *Allen*, 2016 WL 315928, at *3 (quoting *In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d 180, 183 (2d Cir. 2007)); *see also Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Proper preparation of a client's case demands that [the lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."). The privileged communications and their fruits, which resulted from the thought processes of attorneys seeking to gather facts to represent their client responsibly, should be suppressed on this basis as well.

    B.    The Prosecution's Unwarranted Intrusion on Mr. Buyer's Attorney-Client Privilege Requires a *Kastigar* Hearing.

The government's use of privileged materials in the search warrants and Indictment requires a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 460 (1972) and the Second Circuit's decision in *Schwimmer*, 924 F.2d at 446, in which the government would bear the burden of showing the extent of taint in the prosecution so that the Court may fashion an appropriate remedy. *See United States v. Allen*, 864 F.3d 63, 91 (2d Cir. 2017). The Second Circuit borrows the Fifth Amendment *Kastigar* standard in analyzing attorney-client privilege violations and prohibits direct or derivative use of such material in criminal prosecutions.[9] *See Schwimmer*, 924 F.2d

---

[9] Some have suggested that searching and seizing privileged material is also a Fourth Amendment violation, because such seizure would violate the Amendment's "touchstone" of "reasonableness." *See* Eric D. Mcarthur, *The Search and Seizure of Privileged Attorney-Client Communications*, 72 U. Chi. L. Rev. 729, 746 (2005) ("[I]n the absence of some justification greater than probable

at 445 (applying the *Kastigar* standard to the government's use of privileged information in a criminal prosecution). "This total prohibition on use provides a comprehensive safeguard, barring the use of [privileged information] as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Landji*, 2021 WL 5402288, at *28 (quoting *Kastigar,* 406 U.S. at 460). "To warrant a taint hearing, Defendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution." *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)).

Once a defendant makes this threshold showing, the burden shifts to the government to prove "that the evidence it proposes to use is derived from a legitimate source wholly independent of the [privileged information]." *Landji*, 2021 WL 5402288, at *28 (quoting *Kastigar*, 406 U.S. at 460). The government's burden is more than simply "a negation of taint; rather, it [has] the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the [privileged information]." *See Allen*, 864 F.3d at 91 (2d Cir. 2017); *see also United States v. Hoey*, 725 F. App'x 58, 61 (2d Cir. 2018) (defendant "had to show a factual connection between the allegedly privileged information and the charges in this case" to shift burden to government).

Remedies under *Kastigar* vary based on the circumstances but can include dismissal of the indictment or suppression of evidence obtained through use of the prohibited evidence. *See United*

---

cause, the Fourth Amendment prohibits the search and seizure of privileged attorney-client communications."); *see also Riley v. California*, 573 U.S. 373, 381–82 (2014) ("the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Whether the Court considers it a stand-alone violation of an evidentiary privilege that borrows its standard from Fifth Amendment compulsion doctrine, or whether it is a Fourth Amendment violation, the analysis is the same.

14

*States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir. 1995) (collecting cases on Fifth Amendment *Kastigar* violations). Courts should suppress the fruits of warrants that rely on such evidence. *See id.*; *Schwimmer*, 924 F.2d at 445 (district court ordered to "determine whether the government's case was in any respect derived from a violation of the attorney-client privilege and, if so . . . what use was made of the derivative information and whether that use affected a substantial right of the appellant."); *see also United States v. Ghailani*, 743 F. Supp. 2d 242, 249 (S.D.N.Y. 2010) (examining fruit of the poisonous tree doctrine in Fifth Amendment *Kastigar* context). And some *Kastigar* cases may be so prejudicial as to "require[] disqualification of the entire prosecution team." *United States v. Daniels*, 281 F.3d 168, 182 (5th Cir. 2002) (immunized testimony violation).

This case is drastically different from other recent attorney-client privilege violation cases in this district, where defendants struggled to overcome government claims that the investigation was not influenced by privileged materials. *See, e.g.*, *Landji*, 2021 WL 5402288, at *29; *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) ("Hoey pays strikingly little attention to the fact that the present Indictment concerns a different subject matter than that of the investigation addressed by Judge Stein."). Here, the privileged information bears a direct relation to major underlying investigative steps as well as the charges themselves. After obtaining the email containing the Signal Text Screenshot sometime between August 11, 2020 and December 7, 2020, the government materially relied on and quoted it in the affidavits to eleven search warrants *and in the Indictment*.[10] More disturbing still is that the government actually

---

[10] Indictment ¶ 39; Affidavit, 20 MAG 13063, ¶ 14(d) (S.D.N.Y. Dec. 8, 2020); Affidavit, 21 SW 21, ¶¶ 9(c), 10, 16 (E.D. Va. Feb. 9, 2021); Affidavit, 21 SW 22, ¶¶ 9(c), 10, 16 (E.D. Va. Feb. 9, 2021); Affidavit, 21 MAG 9358, ¶ 9(xx) (S.D.N.Y. Sept. 28, 2021); Affidavit, 21 MJ 03936, ¶ 8(ww) (S.D. Fl. Oct. 1, 2021); Affidavit, 21 MJ 918, 21 MJ 919, and 21 MJ 920, ¶ 10(ww) (S.D. In. Oct. 1, 2021); Affidavit, 21 MJ 922, 21 MJ 923, and 21 MJ 924, ¶ 7(ww) (S.D. In. Oct. 1, 2021). *See* Appendix.

15

quoted Mr. Buyer's use of the label "Privileged" regarding the "Signal Text Screenshot"—the clear implication being that this was evidence that he believed to be special—thereby using his consultation with attorneys directly against him. The government then doubled down, using the Signal Text Screenshot during its interrogation of Mr. Buyer in Miami on October 8, 2021 and in its interview of its key witness from Guidehouse. *See* Alonso Decl. Exs. E, G.

But, as they say, there is more. In ten search warrant affidavits, the government also quoted a screenshot of a different text message that Mr. Buyer emailed himself with the subject line "Privileged," which he later forwarded to counsel for the purposes of receiving legal advice (the "Alicia Text").[11] *See* Buyer Decl. ¶ 12. Again, the affidavits explicitly state that the information came from the screenshot he had sent to himself, not from some other source, and that Mr. Buyer had labeled it "Privileged."[12] In another eight of the warrants, the government also quoted a third message that Mr. Buyer emailed to himself and later forwarded to counsel (the "Budget Medical Text"), Buyer Decl. ¶ 13, although there the affiant did not reference the "Privileged" label.[13]

There is thus simply no question that Mr. Buyer has been severely prejudiced—not only by the repeated intrusions themselves, but also by the government's exploitation of the privileged items to craft its case, warrant-by-warrant and interview-by-interview. The icing on the cake is the specific quotation of the Signal Text in the Indictment, a text the government only had because the defendant had preserved it both pursuant to, and for the purpose of obtaining, legal advice and marked it "Privileged." The Court should therefore order a *Kastigar* hearing.

---

[11] Affidavit, 21 SW 21, ¶ 8(r); Affidavit, 21 SW 22, ¶ 8(r); Affidavit, 21 MAG 9358, ¶ 9(m); Affidavit, 21 MJ 03936, ¶ 8(m); Affidavit, 21 MJ 918, 21 MJ 919, and 21 MJ 920, ¶ 10(n); Affidavit, 21 MJ 922, 21 MJ 923, and 21 MJ 924, ¶ 7(n).
[12] *See supra* note 11.
[13] Affidavit, 21 MAG 9358, ¶ 9(t); Affidavit, 21 MJ 03936, ¶ 8(t); Affidavit, 21 MJ 918, 21 MJ 919, and 21 MJ 920, ¶ 10(u); Affidavit, 21 MJ 922, 21 MJ 923, and 21 MJ 924, ¶ 7(u).

C.    The Government's Wholly Inadequate Use of a Filter Team Provides an Independent Reason to Order a Hearing to Determine the Extent of the Taint.

Until one member of the current prosecution team was exposed to a clearly privileged email during the initial review of the fruits of the first warrant issued in this case, directed to internet service providers (the "First Warrant")—the government did not plan to use a filter team.[14] Alonso Decl. Ex. J. As a result, at least one Assistant U.S. Attorney saw an email between Mr. Buyer and counsel before calling in a filter team. Because the filter team process necessarily allows intentional government intrusion into privileged information and was created to be a more expedient procedure than *in camera* review or a special master, the government must at a minimum establish that the procedure used adequately safeguarded the defendant's rights. As discussed above, numerous privileged emails and screenshots made it through the filter team, underscoring that no such adequate safeguards existed here.

No less an authority than the Department of Justice has recognized that "[a]lthough no single standard has emerged, courts have generally indicated that evidence screened by a filter team will be admissible only if the government shows that its procedures adequately protected the defendants' rights and no prejudice occurred." *See* H. Marshall Jarrett, et al., U.S. Dep't of Just., [*Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*](#) (2009). Thus, where, as here, "the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review . . . it bears the burden to rebut the presumption that tainted material was provided to the prosecution team." *United States v. Neill,* 952 F. Supp. 834, 841 (D.D.C. 1997). Courts in

---

[14] A filter team is "a separate group of attorneys and agents who [are] not part of the investigative team" who review seized materials to segregate anything that is potentially privileged. *In re Search Warrants Executed on Apr. 28, 2021*, No. 21-MC-425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021), *appeal withdrawn* (June 30, 2021).

17

the Second Circuit have generally upheld filter teams if "the putative privilege holder (or its designee) has notice and the opportunity to raise objections with the court before potentially privileged materials are disclosed to members of the prosecution team." *United States v. Avenatti*, 559 F. Supp. 3d 274, 284 (S.D.N.Y. 2021) (Furman, J.). But as to the First Warrant, Mr. Buyer and his counsel were given no such opportunity. The Court therefore has more than enough before it to require the government to show freedom from taint under *Kastigar* and *Schwimmer*, and that its team was not exposed to *additional* privileged materials in light of its substandard filter protocols.

D.    The Court Should Order Disclosure of the Grand Jury Minutes or Alternatively Review Them *In Camera.*

The use of the Signal Text in the warrants and the Indictment provide strong reason to believe that the government used the privileged Signal Text Screenshot before the grand jury. For that reason, Mr. Buyer moves for disclosure of the grand jury minutes under Fed. R. Crim. P. 6(e)(3)(E)(ii) or, alternatively, *in camera* review by the Court for the limited purpose of determining whether the Indictment was secured through use of privileged information or documents. Although grand jury proceedings are secret, the Federal Rules of Criminal Procedure permit the Court to authorize disclosure of grand jury minutes "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The grand jury's presumption of regularity can be overcome by "concrete allegations of Government misconduct." *United States v. Leung,* 40 F.3d 577, 582 (2d Cir. 1994). "To invoke disclosure under this Rule, 'a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity.'" *United States v. Kirton*, No. 20-CR-322 (PMH), 2021 WL 1550423, at *1 (S.D.N.Y. Apr. 20, 2021) (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001)).

18

Here, Mr. Buyer stands indicted following exploitation of his attorney-client privilege and work product protections because the government obtained, reviewed, and used, at a minimum, the Signal Text Screenshot in the Indictment, and in fact quoted it in paragraph 39. The search warrants cast Mr. Buyer's use of the subject line "Privileged" as something sinister, and although the Indictment does not go quite so far, it seems likely that the grand jury was told about the "Privileged" marking in the same way the Magistrate Judges were. Barring some alternative explanation not apparent from the voluminous discovery, it is evident that the government presented the Signal Text Screenshot to the grand jury, giving the Court ample grounds to order disclosure of the grand jury minutes to the defense, or at least review them *in camera* to assess the extent of the damage to the integrity of the grand jury process.

**III.    THE COURT SHOULD ORDER A *FRANKS* HEARING TO DETERMINE WHETHER EVIDENCE SEIZED PURSUANT TO SIXTEEN WARRANTS SHOULD BE SUPPRESSED.**

The affidavit in support of the First Warrant included a material false statement attributed to Mr. Buyer: that he told Guidehouse lawyers that he had traded in Navigant stock based on research reports sent by his son (the "False Statement"). This statement, made by the affiant in reckless disregard for the truth, manufactured sinister intent from an innocuous act by creating the appearance Mr. Buyer invented a lame ruse to cover up his activity, suggesting the coincidental receipt of a report from his son. What Mr. Buyer *actually* said—as accurately captured in later affidavits and the Indictment itself—is that his trades were based on his own research. This critical distinction makes all the difference, and the False Statement was, at best, recklessly included in support of the first warrant and materially impacted the existence of probable cause.

Additionally, eleven later warrants contain intentional or reckless material omissions, because they rely on privileged screenshots and emails seized pursuant to the First Warrant (*see* Section II) without supplying the relevant context that would likely have defeated the issuance of

19

the warrants. The affidavits in support note that the emails containing the screenshots were labeled "Privileged" but provide none of the crucial context that they were prepared at the direction of counsel or that "Privileged" refers to the *attorney-client* privilege. These reckless omissions (the "Omissions") leave the reader with the false impression that Mr. Buyer's use of "Privileged" had sinister implications. Based on both the False Statement and the Omissions, we move for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether evidence seized pursuant to these warrants—and any that rely on that evidence in their supporting affidavits—should be suppressed for violation of Mr. Buyer's rights under the Fourth Amendment.

A defendant seeking a *Franks* hearing "must make a 'substantial preliminary showing' by a preponderance of the evidence that an affidavit in support of the search warrant contained a deliberate falsehood or a statement made with reckless disregard for the truth which was material to the probable cause determination." *United States v. Polanco*, No. 19 CR 354-LTS, 2020 WL 1503672, at *3 (S.D.N.Y. Mar. 30, 2020) (citing *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). If, at a *Franks* hearing, the defendant establishes by a preponderance of the evidence that the statement resulted from "perjury or reckless disregard" and, setting that statement aside, the remaining content of the affidavit "is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156. For omissions, the standard is the same except the omissions should be added back in.

The relevant question is whether the false statement or omission was "made in reckless disregard of whether it would mislead." *United States v. Lambus*, 897 F.3d 368, 399 (2d Cir. 2018) (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)). Recklessness is a question of fact. *Lambus*, 897 F.3d at 399. False statements are reckless where the affiant "had 'knowledge

20

that the statement was false'; 'had a serious doubt as to the truth of the statement when he or she made it'; or 'had obvious reason to doubt the veracity of the statement.'" *United States v. Lahey*, 967 F. Supp. 2d 698, 721 (S.D.N.Y. 2013) (quoting *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *9 (S.D.N.Y. Nov. 24, 2010)). Omissions are reckless where "there is 'credible and probative evidence' which allows the Court to infer that the affiant omitted the information with 'reckless disregard to whether the omissions would mislead.'" *Lahey,* 967 F. Supp. 2d at 721 (quoting *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013)).

A.    <u>The Court should order a *Franks* hearing because the Affidavits in Support of the First and Third Warrants included a materially false statement made with reckless disregard for whether it would mislead.[15]</u>

The First Warrant in this case authorized seizure of "all content and other information associated with" certain email and iCloud accounts.[16] The affidavit in support was based wholly on the coincidental timing of certain trades, telephone calls, and innocuous emails, plus the demonstrably False Statement attributed to Mr. Buyer: that he had told Guidehouse lawyers in October 2019 that "his trading in Navigant was based on two Zacks Investment Research Reports provided by his son, Ryan Buyer." Affidavit, 20 MAG 8471 ¶ 26(tt). The affiant, FBI Special Agent Michael Preis ("SA Preis") learned of this statement through an elaborate game of telephone: (1) an unnamed source at the SEC told SA Preis that (2) unnamed Guidehouse attorneys told the SEC that (3) in Guidehouse's interview of Mr. Buyer, Mr. Buyer made the above statement. *Id.*

---

[15] These arguments also apply to the Second Warrant (20 MAG 8730), which relies almost exclusively on the First Warrant's Affidavit. Affidavit, 20 MAG 8730, ¶ 5 (incorporating the affidavit to 20 MAG 8471). However, as far as Mr. Buyer's counsel is aware, the Second Warrant did not result in the production of any documents. Because providers sometimes make mistakes about what evidence they possess, and because the Second Warrant relies on the same affidavit as the First, we include it in this motion in an abundance of caution.

[16] The First Warrant requests access to a Guidehouse employee's iCloud; same employee's email address; Mr. Buyer's iCloud account; three of Mr. Buyer's email addresses; and iCloud accounts belonging to two other individuals. Affidavit, 20 MAG 8471, ¶ 2.

As the government will concede, however, and as it made clear in subsequent affidavits and in the Indictment, Mr. Buyer did not tell Guidehouse that he received the Zacks reports *from* Ryan; rather, he stated that *he* conducted the research and sent the reports *to* Ryan. *See, e.g.*, Affidavit, 21 MJ 3936, ¶ 8(vv) (different FBI agent's affidavit states that "Stephen Buyer said that his trading in Navigant was based on two Zacks Investment Research Reports that *he sent to his son.*" (emphasis added)). This makes an enormous difference: in context, the False Statement comes at the end of a long recitation of cherry-picked communications and trades, leading the reader to infer that Mr. Buyer was making up a justification (i.e., "My son picked the stocks"), even though Mr. Buyer actually said that he conducted the research himself, an unremarkable statement.

The False Statement, based on three uncorroborated layers of hearsay, was made in reckless disregard of whether it would mislead, and as far as we can tell, the original Magistrate Judge has not been made aware of it. Reliance upon that many levels of hearsay alone provides "obvious reason to doubt the veracity of the statement." *Lahey*, 967 F. Supp. 2d at 721 (quoting *Rajaratnam*, 2010 WL 4867402, at *9). Although an affiant and issuing court of course "may consider hearsay in determining probable cause if there is a substantial basis to credit the hearsay statement," *United States v. Christopher*, No. 19 CR 875-LTS, 2020 WL 5518216, at *3 (S.D.N.Y. Sept. 13, 2020) (Swain, J.) (citing *Illinois v. Gates*, 462 U.S. 213, 244–45 (1983)), the affiant has to actually make out that substantial basis—whether through corroboration, *United States v. McKenzie*, 13 F.4th 223, 238 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 2766 (2022), or the inherent reliability of the hearsay declarant, *Christopher*, 2020 WL 5518216, at *3.

SA Preis did not even attempt to offer corroborating evidence for the False Statement. His reliance on unnamed SEC staff only gets us one-third of the way through the hearsay. Affiants may only rely on the "observations of *fellow officers* of the Government engaged in a common

22

investigation." *See Christopher*, 2020 WL 5518216, at *3 (emphasis added) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)). Here, the affiant is not relying on a fellow officer's observations, but instead an unnamed employee of a different agency's report of a *private citizen's* observations of *another private citizen's* statement. Blind trust in unverified second-hand information does not adequately "reduce the chances of a reckless or prevaricating tale" to justify reliance on three levels of hearsay. *See McKenzie*, 13 F.4th at 238 ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" (quoting *Gates*, 462 U.S. at 244–45)). Nor would it have been difficult for SA Preis to find the correct statement, as his affidavit makes clear that he had access to "documents provided by the [SEC]" and "emails and other documents provided by Guidehouse." Affidavit, 20 MAG 8471, ¶ 26. Assuming *arguendo* that these documents were not helpful, given the coordination between the government agencies here (*see* Section IV), SA Preis had substantial opportunity to ensure that his affidavit was accurate. His failure to corroborate the underlying statement he learned through layers of hearsay was reckless, and it resulted in the inclusion of a demonstrably and materially false statement in his affidavit.

Such recklessness carried over to SA Preis's affidavit in support of the third search warrant—20 MAG 13063 (the "Third Warrant").[17] That affidavit incorporates by reference the affidavit in support of the First Warrant, but also contains the False Statement and only two new pieces of substantive information: (1) that on June 13, 2019, Mr. Buyer emailed himself excerpts from two Zacks research reports, and (2) that Mr. Buyer sent himself the Signal Text Screenshot. We

---

[17] The Third Warrant granted re-access to two of Mr. Buyer's three email accounts due to logistical issues accessing them from the original warrant. Affidavit, 20 MAG 13063, ¶¶ 5–7.

23

will not quote the screenshot because it is privileged, but it contradicts the False Statement. Affidavit, 20 MAG 13063, ¶¶ 14(a), (c), (d). Yet when confronted with facts that fundamentally contradicted the uncorroborated triple-hearsay False Statement, SA Preis appears to have shut his eyes to an "obvious reason to doubt the veracity of the statement." *Lahey*, 967 F. Supp. 2d at 721 (quoting *Rajaratnam*, 2010 WL 4867402, at *9). The failure to corroborate or correct the False Statement—this time facing blatantly contradictory evidence—showed reckless disregard for the truth.

The False Statement was material to a finding of probable cause, as it spins an anodyne statement into one appearing to create a *post hoc* cover story for Mr. Buyer's actions. While "probable cause does not require a prima facie showing [of criminality]," *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005), it does require a "probability or substantial chance of criminal activity," *United States v. Backhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990); *see also United States v. Juwa*, 508 F.3d 694, 710 (2d Cir. 2007). The False Statement's inclusion suggests to the Magistrate Judge that Mr. Buyer sought to cover up his conduct by telling Guidehouse counsel that his son—and not an insider—led him to Navigant. Without the False Statement—and the related implication that Mr. Buyer was trying to hide his misdeeds—the affidavit at best establishes that Mr. Buyer spoke to someone who spoke to someone with MNPI, that he conducted online research into Navigant, and then made several trades during the pre-announcement period. It in no way establishes that *he himself* was in possession of MNPI when he traded. What remains is an affidavit asserting coincidental and innocuous circumstances, lacking the drama of a ruse that favors a finding of probable cause. Because the recklessly misleading False Statement creates a demonstrably false narrative about Mr. Buyer's pre-trade activity, it was material to the probable cause finding. Accordingly, a *Franks* hearing is required, and these warrants and their fruits should be suppressed.

24

B.      All subsequent warrants should be suppressed as the fruit of the poisonous tree.

If the Court determines that the First Warrant lacks probable cause without the False State-

ment made in the affidavit, all of its fruits should be suppressed. As all subsequent search warrants

relied on information obtained via the First Warrant to show probable cause, such a finding will

require an examination of those warrants to determine whether they make out probable cause with-

out the illegally seized evidence. *See United States v. Williams*, 365 F. Supp. 3d 343, 350 (S.D.N.Y.

2019) ("Evidence seized during an illegal search should not be included in a search warrant affi-

davit."); *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Not only did several of the later

affidavits contain emails and screenshots seized as a result of the First Warrant, *see, e.g.*, Affidavit,

21 MAG 9358, ¶¶ 9(m), (t), (xx); but they also directly incorporated by reference the defective

affidavit in support of the First Warrant, *see* Appendix.[18] As the Court will see, all of the later

warrants are inextricably intertwined with the fruits of the First Warrant, requiring suppression of

items seized pursuant to those warrants as the fruit of the poisonous tree.[19]

C.      The Court should include in the *Franks* hearing eleven search warrants that improperly
        and materially rely on material omissions about privileged communications.

Additionally, the eleven[20] search warrants that rely on the Signal Text Screenshot, the Al-

icia Text Screenshot, or both, should also be included in the *Franks* hearing, because the agent left

out the critical information that these emails were all part of a larger privileged conversation with

his lawyers. As explained at length in Section II above, this was the reason they were marked

---

[18] For ease of reference, we have included as an Appendix to this Memorandum of Law a chart
listing each of the warrants at issue together with the relevant issues raised and paragraph numbers.
[19] This is also true for the seven warrants directed at other people, as they were obtained through
earlier violations of Mr. Buyer's rights.
[20] This number also includes the Third Warrant, which, as discussed above in the privilege discus-
sion (Section II), relies on the Signal Text Screenshot.

25

"Privileged." In addition to misleading the Magistrate Judge about these two screenshots, the affiants left out that the Alicia Text Screenshot had additionally been forwarded to counsel and was also clearly privileged. This was known to the government, as explained in Section II. Simply put, no judicial officer would order a warrant knowing that the information within it came from attorney-client privileged or work product material, thus making the Omissions critical to the probable cause determination. Notably, among these eleven subsequent warrants, the Third, Fourth, and Fifth Warrants—20 MAG 13063, 21 SW 21, and 21 SW 22—are in their own category as the only warrants whose affidavits contained both the False Statement and the Omissions. *See* Appendix.

## IV.   THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE FAVORABLE MATERIAL PURSUANT TO THE BRADY DOCTRINE, THE COURT'S RULE 5(f) ORDER, AND THE COURT'S INDIVIDUAL PRACTICES.

The doctrine of *Brady v. Maryland*, 373 U.S. 83 (1963), as well as the Court's order under Fed. R. Crim. P. 5(f) (ECF No. 7), require the government to provide favorable information to the defense as soon as its favorable character becomes evident to any member of the government team—without regard to whether or not the defense has requested it. Here, the government has produced a small amount of *Brady* material *sua sponte*, but we believe there is more. Rather than make a scattershot request, the defense made a surgical one: We asked only that the government include the SEC within its search for *Brady* material, and that it identify material that falls into one of eight discrete categories. The government's responses have been insufficient as to all, and we now ask the Court to order that the government order the U.S. Attorney's Office to search for *Brady* material within the files of the SEC and produce the additional requested information.

A.   <u>Materials in the SEC file are subject to the government's obligations under *Brady* and its progeny, as well as this Court's individual practices.</u>

On July 25, 2022, the United States Attorney for the Southern District of New York and the Director of the SEC's Division of Enforcement stood together at a joint press conference to

26

announce that each had filed insider trading charges against Mr. Buyer. Larry Neumeister, *Ex-US Congressman Among 9 Charged in Insider Trading Cases*, U.S. News & World Report (July 25, 2022). In their respective press releases, each office also thanked the other for its assistance in the investigation. U.S. Att'ys' Off., S.D.N.Y., U.S. Dep't of Just., *U.S. Attorney Announces Charges in Four Separate Insider Trading Cases Against Nine Individuals, Including Former U.S. Congressman, Former FBI Agent Trainer, Tech Company Executives, and Former Investment Banker* (July 25, 2022); U.S. SEC, *SEC Charges Former Indiana Congressman with Insider Trading* (July 25, 2022). U.S. Attorney Williams also forcefully stated at the time that the case would not have been filed without "close coordination" with the SEC. U.S. Att'ys' Off., S.D.N.Y., *Press Conference* (July 25, 2022). Despite the coordination between these two agencies, which included joint interviews of key witnesses, the government denies that the SEC is part of the prosecution team, and therefore disclaims any obligation to search for *Brady* material in the SEC's files. Alonso Decl. Ex. B. Notwithstanding that position, the government reports that, as a "courtesy," it has contacted the SEC to review its file, a request the SEC is merely "consider[ing]." *Id.*; Alonso Decl. ¶ 12. We ask the Court to order the government to seek and provide such material to Mr. Buyer.

*Brady* and its progeny, including *Kyles v. Whitley*, 514 U.S. 419 (1995), well establish the government's affirmative duty to seek out and disclose all information or evidence that is material to guilt or punishment. *Brady*, 373 U.S. at 87; *see United States v. Bagley*, 473 U.S. 667, 675 (1985). The USAO "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case," *Kyles*, 514 U.S. at 437, and such duty "extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (Rakoff, J.). The fact "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged

misconduct makes perfect sense; but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all." *Id*. at 492. This is not merely a theoretical concern: the National Registry of Exonerations lists the case of Kenneth Mahaffy, whose securities fraud conviction was reversed based on the failure to turn over exculpatory information possessed by the SEC. *United States v. Mahaffy,* 693 F.3d 113, 118 (2d Cir. 2012).

Indeed, this Court's individual practices explicitly instruct the government to "seek Brady Material and Giglio Material from law enforcement and regulatory agencies that are or have been involved in the prosecution of the defendant *or in parallel proceedings or investigations involving the defendant*." Individual Practices of Hon. Richard C. Berman, *Pre-trial Procedures, Prior to Trial in Criminal Cases* § 5.C.2.d (Nov. 16, 2020) (emphasis added). Although some courts make distinctions between "parallel" and "joint" investigations for *Brady* purposes, *e.g., United States v. Martoma*, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014); *Gupta,* 848 F. Supp. 2d at 494-495, and the government appears to rely on this distinction here (Alonso Decl. Ex. B), this Court's rules explicitly eliminate this distinction. That should be the end of the issue.

But even if the Court were to allow the government to sidestep these rules, this case plainly falls on the "joint" side of the joint/parallel distinction that other courts make. The U.S. Attorney admitted as much when he announced these charges: "Bringing a case of this variety and scope *requires close coordination with all of our law enforcement partners*, and none of the cases that I've announced today would've been brought without the dedication and incredible work of our partners at the FBI *and the SEC* . . . their partnership is truly tremendous." U.S. Att'ys' Off., S.D.N.Y., *U.S. Attorney Announces Charges in Four Separate Insider Trading Cases Against Nine Individuals* (July 25, 2022) (emphasis added). Additionally, the context-based analysis other courts

28

use focuses on the fact-gathering phase of an investigation, such as whether interviews were conducted jointly, agencies conferred about the investigation and/or provided each other with documents. *See, Martoma*, 990 F. Supp. 2d at 461; *Gupta,* 848 F. Supp. 2d at 494-495. Here, it is clear from the limited *Brady* material the government has provided that key interviews in this matter were conducted jointly, and the agencies conferred and shared materials. *See, e.g.,* Alonso Decl. Ex. I (FBI Report of Witness A Interview (May 6, 2022)) (3507-003) (noting attending attorneys from both USAO and the SEC); Alonso Decl. Ex. F, FBI Report of Witness B Interview (June 10, 2021) (3505-001) (noting attending attorneys from both USAO and the SEC). For example, as explained in our *Franks* motion (Section III), the FBI had access to the SEC's non-public files, on which it relied (falsely, as discussed above) to obtain the search warrants that provided them with the evidence in this case.

Notwithstanding the "close coordination," the Assistant U.S. Attorneys persist in maintaining that their obligation does not extend to the SEC. Although they have asked the SEC to let them review its files for *Brady* and *Giglio* material, the prosecutors claim to have done so as a courtesy rather than a responsibility imposed by Court rule and the law, and they have put the onus on the SEC to grant the government access. While courtesies are always appreciated, the government's position is too oblique and provides no guarantee that the search will ever be conducted. We request that the Court reject this position and order the government to seek and produce material from the SEC pursuant to its obligations under *Brady* and the Court's individual practices.

    B.    <u>The Court should order the government to produce to Mr. Buyer the limited *Brady* and additional evidence requested by counsel.</u>

On October 3, 2022, counsel sent the government a letter requesting certain information material to the preparation of Mr. Buyer's defense pursuant to *Brady* and its progeny, the Court's pending Rule 5(f) order, the Court's Individual Practices, other government policies and ethical

obligations requiring such production, and Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring production of all items "within the government's possession, custody, or control" that are "material to preparing the defense"). Alonso Decl. Ex C. In addition to the request for *Brady* material in the SEC files discussed above, the October 3 requests were limited in nature, seeking (as relevant here) the following items in the government's possession, custody, or control:

1. Statements made to any government representative (whether oral or written) that Mr. Buyer was not in possession of material, non-public information (MNPI) at the time he allegedly traded in the stock of (a) Sprint or (b) Navigant.
2. Any notes, minutes, or agendas of meetings and/or calls among T-Mobile personnel and/or consultants at which either:
   - the Sprint transaction was discussed and Mr. Buyer was not present; or
   - Mr. Buyer was present and the Sprint transaction was not discussed.
3. Any notes, minutes, or agendas of meetings and/or calls among Guidehouse personnel and/or consultants at which either:
   - the Navigant transaction was discussed and Mr. Buyer was not present; or
   - Mr. Buyer was present and the Navigant transaction was not discussed.
4. All information or reports analyzing or recommending the purchase of Sprint stock at or around March and/or April 2018.
5. All information or reports analyzing or recommending the purchase of Navigant at or around June, July, and/or August 2019.
6. All non-disclosure agreements drafted and/or executed as part of (a) the Sprint acquisition by T-Mobile and (b) the Navigant acquisition by Guidehouse.
7. Any information tending to show that T-Mobile personnel read Mr. Buyer into the Sprint deal on April 6, 2018 or later.
8. Any information tending to show that Guidehouse read Mr. Buyer into the Navigant deal at any time.

*Id.* (The defense also made limited additional requests that we are not pressing in this motion.). The government has not contested or confirmed that the above information would be favorable information subject to disclosure, but has asserted that it has provided all such material in its possession, custody, or control; that any subsequently identified *Brady* material would be provided promptly upon discovery; and that all Jencks Act material would be provided subject to a pretrial disclosure schedule. Alonso Decl. Ex. B. As to #7 and #8, the government stated that it had produced all Rule 16 material. *Id.*

As the Court can see, the limited information sought is plainly favorable, material to the preparation of the defense, or both, and therefore subject to production. To the extent the government may argue that it has made substantial productions and therefore that the defense should "go find it," burying exculpatory information in voluminous records does not satisfy its *Brady* obligations. To date, the government has produced to Mr. Buyer's counsel more than one million documents comprising more than *three million* pages across five productions—a far cry from the 76,000 the government represented at arraignment. Alonso Decl. ¶ 13; *see also* ECF No. 11 at 7:6–10 (government expects 76,000, although that number was expected to "go up a little bit as subpoena returns continue to come in."). Where *Brady* material does exist, the Second Circuit takes a dim view when the government buries it in a large volume of documents or does not provide it in a timely manner. *See United States v. Gil,* 297 F.3d 93, 106–07, 108 (2d Cir. 2002) (reversing mail fraud conviction where one document negating fraudulent intent "was among five reams" of 18 U.S.C. § 3500 material); *cf. United States v. Bortnovsky*, 820 F.2d 572, 574–75 (2d Cir. 1987) (*per curiam*) (reversing mail fraud and other convictions based on denial of bill of particulars, even though all the information had been provided by the government before trial within group of 4,000 documents). Accordingly, we ask the Court to order the government to promptly seek and produce all material responsive to Mr. Buyer's limited requests.

## V.    THE COURT SHOULD ORDER A LIMITED BUT NECESSARY BILL OF PARTICULARS

Although the Indictment contains some of the circumstances surrounding Mr. Buyer's alleged trading in the stock of Sprint and Navigant, it is conspicuously devoid of details of *what* information exactly he is supposed to have "misappropriated," when, and from whom. Specifically, for each of the four counts in the Indictment, we requested from the government "the information that he is alleged to have learned, the source of that information, and the timing of any such

31

disclosure(s)." Alonso Decl. Ex. A. The government has declined our request. Alonso Decl. Ex. B. Without that crucial information, Mr. Buyer's defense team cannot ascertain whether the information was (a) non-public in the first place, and (b) material, both key elements of the charges. Mr. Buyer denies having received MNPI from anyone and plans to vigorously defend himself against the charges in the Indictment, but the government's refusal has put him in a position where he cannot effectively prepare a defense. For that reason, we move this Court for a limited bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).

The Indictment alleges that in the course of his consulting work, Mr. Buyer misappropriated unspecified MNPI that he learned as a consultant and used that MNPI to make profitable securities trades in Sprint and Navigant stock. Indictment ¶¶ 2, 8, 24. Although the Indictment describes various circumstantial facts surrounding the timing of Mr. Buyer's trades, such as speaking on the telephone and playing golf with an insider at T-Mobile before purchasing Sprint shares (Indictment ¶¶ 14 and 15), receiving an invitation to a business update meeting and purchasing additional shares (Indictment ¶¶ 19 and 20), and speaking on the telephone with an insider at Guidehouse before conducting research on Navigant and purchasing its shares (Indictment ¶ 32), the closest it ever gets to specifying any details about the MNPI is to allege generally that Mr. Buyer "defrauded T-Mobile of confidential information related to T-Mobile's renewed merger discussions with Sprint" (Indictment ¶ 43) and "defrauded Guidehouse of confidential information related to Guidehouse's negotiations to acquire Navigant" (Indictment ¶ 47).[21]

---

[21] To be sure, a heading on page 5 reads, "BUYER Learns of the Renewed Merger Discussions and Trades on the Information," and another on page 9 reads, "BUYER Learns of Guidehouse's Potential Acquisition and Trades on the Information." But the headings are not backed up by actual allegations in the text beyond that quoted above. And if the answer is as simple as (1) the fact that the T-Mobile/Sprint talks were back on and (2) the fact that Guidehouse was potentially going to acquire Navigant, one wonders why the government is so reticent to simply say so, and provide the other crucial information about when he supposedly acquired the information and from whom.

To conform with the Sixth Amendment's requirement that a defendant "be informed of the nature and cause of the accusation" (U.S. Const. amend. VI), an indictment must be specific enough to permit a defendant to prepare a defense. *See United States v. Hess*, 124 U.S. 483, 487 (1888); *Russell v. United States*, 369 U.S. 749, 765 (1962); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999); *see also United States v. Brozyna*, 571 F.2d 742, 746 (2d Cir. 1978) (indictment should be sufficiently clear so that defendant "will not be misled while preparing his defense"). When an indictment is drawn generally and fails to adequately set forth the charges, Rule 7(f) permits the court to grant a bill of particulars requiring the government to set forth "the specific allegations of the offense charged." *United States v. Wozniak*, 126 F.3d 105, 110 (2d Cir. 1997). A motion for a bill of particulars should be granted where it would provide details of the charged offense that are "necessary to the preparation of [the] defense, and to avoid prejudicial surprise at the trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (internal quotation marks omitted), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010).

As charged, the Indictment is insufficient to allow Mr. Buyer to defend against the factually complex schemes alleged. Simply put, information about what specific, articulable MNPI Mr. Buyer allegedly received goes to the heart of the charges, is missing from the Indictment, and is necessary to avoid unfair surprise and defend himself at trial. *See also* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring production of all items "within the government's possession, custody, or control" that are "material to preparing the defense"). And as the Court can see, we have neither requested evidentiary detail nor made a scattershot request. Nor does Mr. Buyer seek a preview of the government's intended arguments or theories of the case. That is, we are not seeking information in the bill of particulars about *how* the government intends to prove its case. But because

33

the government has charged Mr. Buyer with trading based on MNPI, it is imperative that he understand *what* information the government intends to prove was obtained, misappropriated, and traded on. Mr. Buyer is entitled to defend himself against these charges by challenging the notion that any information conveyed—if at all—was non-public, material, or both. Numerous courts have granted particulars under similar circumstances. *See United States v. Contorinis*, No. 09 Cr. 1083 (RJS), slip. op. at 1 (S.D.N.Y. May 5, 2010) (granting bill of particulars "with respect to the material, nonpublic information allegedly disclosed"); *United States v. Nacchio*, 05-cr-00545-EWN, 2006 WL 2475282, at *6 (D. Colo. August 25, 2006) (directing government to "identify 'all material nonpublic information that the Government claims Defendant was aware of [during relevant dates].'"); *United States v. Falbo*, No. 92 CR. 0763 (PNL), 1993 WL 147441, at *1 (S.D.N.Y. April 6, 1993) (granting bill of particulars for "the material nonpublic information the government will contend that defendant(s) learned."); *United States v. Santoro*, 647 F. Supp. 153, 188 (E.D.N.Y. 1986) (McLaughlin, J.) ("[A] defendant cannot be expected to defend against a charge of insider trading without knowing what the inside information is"), *rev'd on other grounds United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988).

To the extent the government might claim it cured deficiencies by providing ample discovery, "mountains of documents" do not fulfill the government's Sixth Amendment specificity obligations. *Bortnovsky*, 820 F.2d at 575; *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (government "ha[d] not yet complied with its obligation to provide adequate notice to the defense" where it produced 200,000 pages of documents but did not inform the defendants which claims they alleged were fraudulent). And, importantly, as far as we can tell the discovery provided to date does not identify the MNPI alleged to have been obtained by Mr. Buyer, nor does it provide specifics about the source or timing of the provision of any MNPI. Directing

34

Mr. Buyer's counsel to the affidavits is insufficient, as none provides the information necessary to prepare Mr. Buyer's defense. And if the answer is that the government does not know, then that itself is favorable information that should at a minimum be produced under this Court's Rule 5(f) order. For all these reasons, the government has failed to meet the specificity requirement of the Sixth Amendment, and a bill of particulars is appropriate to cure that deficiency and allow Mr. Buyer to adequately prepare his defense to these charges.

**CONCLUSION**

The Court should grant defendant's motions in their entirety, and order whatever additional relief it deems just and proper.

Dated:      New York, New York
            October 21, 2022

/s/ *Daniel R. Alonso*
Daniel R. Alonso
Olivia A. Rauh
Michael S. Chu

Buckley LLP
1133 Avenue of the Americas, Suite 3100
New York, New York 10036
Tel: (212) 600-2400
dalonso@buckleyfirm.com
orauh@buckleyfirm.com
mchu@buckleyfirm.com

Henry Asbill
Buckley LLP
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 349-8000
hasbill@buckleyfirm.com

*Attorneys for Defendant Stephen Buyer*

35